IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JERRY M. LINSTROM,                          )
                                            )
                 Plaintiff,                 )   TC-MD 180084N
                                            )
        v.                                  )
                                            )
LINCOLN COUNTY ASSESSOR,                    )
                                            )
                 Defendant.                 )   **FINAL DECISION[1]**

Plaintiff appeals the real market value and maximum assessed value of property

identified as Account R61258 (subject property) for the 2016-17 and 2017-18 tax years.  A trial

was held on July 9, 2018, at the Oregon Tax Courtroom, in Salem, Oregon.  Tom A. Linstrom

(Linstrom), Plaintiff's brother, appeared and testified on behalf of Plaintiff.[2]  Terry Shawn Wylie

(Wylie), Chief Appraiser, appeared and testified on behalf of Defendant.  Nicholas Kolen

(Kolen), registered appraiser, also testified on behalf of Defendant.  Plaintiff's Exhibits 0.00,

1.00 to 1.06, 2 to 9, 11 at pages 2-4, 12, 13, 14 at pages 2-38, 15, and 18 to 25 were admitted.[3]

Defendant's Exhibits A to M and O to R were admitted into evidence.[4]

/ / /

---

[1] The Final Decision incorporates without change sections I and II of the court's Decision, entered October 16, 2018.  Plaintiff's statement of costs and disbursements and Defendant's objection are discussed in section III.  The court considers Plaintiff's letter filed November 13, 2018, a request for reconsideration.  Pursuant to Tax Court Rule 18 C, "[f]ollowing issuance of a decision * * * the court will not accept motions for reconsideration or to reopen the record[.]"

[2] Plaintiff was present at trial, but did not testify.

[3] The court excluded Plaintiff's Exhibits 0.01 (Defendant's evidence submitted to BOPTA); 10 (a Measure 50 worksheet for the 2016-17 tax year, which represented the removal of a third dock erroneously added by Defendant, not a correction to the boathouse); and 27 (an accounting of Plaintiff's costs and disbursements).

[4] The court excluded Defendant's Exhibit N, which pertained to a prior tax year.  The court admitted Defendant's Exhibits H and M over Plaintiff's objections.  The objections are considered in weighing the evidence.

## I. STATEMENT OF FACTS

The subject property is a riverfront parcel along the Siletz River. (*See* Ptf's Ex 1.03.) It is not buildable and does not qualify for a septic permit. (Ptf's Ex 8 at 1.) The subject property was originally two separate lots, tax lot 301 and tax lot 501, which were combined into a single tax lot, 301, as of the 2016-17 tax year. (*See* Def's Exs F, L.) As of January 1, 2017, the subject property was improved with a floating dock and ramp totaling 1,321 square feet; a second dock totaling 432 square feet; and a multi-purpose shed totaling 152 square feet.[5] (Ptf's Ex 9 at 2.) The subject property previously included a boathouse (described as a "detached garage" in Defendant's records), which was removed in 2012.[6] (Ptf's Exs 1 at 1, 1.02 at 19.)

A.  *Sale of Subject Property*

Plaintiff purchased tax lot 501 for recorded consideration of $30,000 on October 30, 2014, and purchased tax lot 301 for recorded consideration of $35,000 on April 8, 2015. (Ptf's Exs 3, 4.) According to the buyer's final closing statement, Plaintiff's purchase of tax lot 301 included $30,000 worth of personal property. (Ptf's Ex 4 at 4.) Linstrom testified that the $30,000 of personal property was Plaintiff's purchase of an Oregon "floating home/boathouse" permit. (*See id.* at 9-11.) He testified that the permit is personal property because a floating home/boathouse is moveable. Linstrom testified that, after the boathouse was removed in 2012, the prior owner received a "floating home/boathouse" permit that allows the permit holder to construct a boathouse.[7]

---

[5] The improvement sizes were measured by Defendant's appraiser Greg Sutton (Sutton). (*See* Ptf's Ex 9.) Linstrom testified that Plaintiff agreed with Sutton's measurements.

[6] Kolen testified that the boathouse was removed from the 2016-17 tax and assessment roll after he inspected the subject property. He testified that he did not adjust the maximum assessed value to reflect removal of the boathouse because no application was made for the 2016-17 tax year.

[7] Because the subject property is not buildable, the permit would not allow a floating home.

The parties dispute Plaintiff's purchase price for the original lot 301. Wylie questioned the allocation of $30,000 from tax lot 301's purchase price to the permit, noting that Plaintiff produced no independent evidence of the permit value. Additionally, Wylie provided a copy of an MLS listing for tax lot 301 that identified the list price as $75,000 and the sold price as $35,000 on April 8, 2015. (Def's Ex H.) The listing states "River front lot with great newer dock plus a fishing cabin. Water available at street, electric on property. No septic. Sweet spot for your RV, boat etc." (*Id.*) It does not reference a boathouse permit. (*See id.*)

Linstrom testified that the permit is valuable because, in addition to allowing the owner to build a boathouse, it is transferrable to other property owners along the Siletz. He testified that tax lot 301 last sold in 2006 for $40,000 when it included the boathouse and the second dock was not damaged. (*See* Ptf's Ex 15 at 1.) Linstrom questioned the date of the MLS listing provided by Defendant, testifying that he saw a listing for $65,000 with a reference to the boathouse permit. Wylie testified that the MLS listing was the most recent one.

B.    *Real Market Value Evidence*

1.    *Subject property sale price*

Wylie testified that Plaintiff's purchase price for the subject property, trended to the assessment date, is the best evidence of real market value. He testified that Plaintiff knew what he bought when he bought it. (*See* Def's Ex M at 2 (letter from Plaintiff submitted to the Board of Property Tax Appeals (BOPTA) in 2016 stating "We felt that we paid a fair market price for both properties; the rule of thumb is the determined value of anything we purchased is based on the price we paid for it.").) Linstrom testified that Plaintiff never thought the subject property was buildable. (*See* Ptf's Ex 8 (letters confirming that the subject property is not buildable due to insufficient setbacks for septic).) As discussed below, Plaintiff maintains that the subject

property's real market value is less than Plaintiff's purchase price due to use restrictions and square footage errors.

    2.    *Other evidence*

Plaintiff determined the subject property's real market value is $28,322 by separately analyzing the value of the land and each of the subject property improvements. (Ptf's Ex 1 at 2.)

    i.    Land value

Plaintiff maintains that the subject property's land value is negatively impacted by restrictions on use and a square footage error overstating the land size due to the location of the high water line. Plaintiff determined that the subject property land real market value should be reduced to $20,766 to reflect those negative impacts. (*See* Ptf's Ex 1.00 at 3.) He estimated the subject property's land value by determining the value per square foot ($4.13) based on the current tax roll value ($45,000) and multiplying that unit price by his determination that the subject property land is 5,028 square feet rather than 10,890 square feet. (*See* Ptf's Ex 1 at 2.)

With respect to use restrictions, Linstrom testified that Plaintiff applied for and received a permit from the Lincoln County Department of Planning and Development to build a fence and place fill. (*See* Ptf's Ex 5 at 1-2 (approval dated June 9, 2015).) He testified that, subsequently, state and federal agencies required Plaintiff to remove the fill at his own expense because the Siletz River is designated Essential Salmonid Habitat or State Scenic Waterway. (*See* Ptf's Ex 6.) Linstrom testified that Plaintiff thought he could add fill to create more parking space. Wylie testified that the fill permit would have improved the subject property.

With respect to the land size, Plaintiff maintains that 54 percent of the subject property is below the high water line of the Siletz River and, therefore, owned by the State of Oregon. (Ptf's Ex 1.00 at 3.) Defendant's records describe the subject property as 0.25 acres. (*See, e.g.,* Def's

Ex L.)  The MLS listing for the original tax lot 301 describes it as 0.11 acres, which is consistent with Defendant's records prior to combination of the two tax lots.  (*See* Def's Ex F, H.)  The deeds for original tax lots 301 and 501 each state that one boundary line of the property is the high water line or mark of the Siletz River.  (*See* Ptf's Ex 3 at 3 (boundary is "the mean high water line of the Siletz River"), Ex 4 at 1 (excepted from the conveyance is "any portion lying below the high water mark of the Siletz River").  To support his claim that the subject property land is significantly smaller than 0.25 acres, Plaintiff provided a survey of the subject property dated February 12, 2018, showing the mean high water line and stating the subject property's total area as 5,028 square feet, or 0.12 acres.  (Ptf's Ex 1.03 at 1.)  Plaintiff also provided a survey dated January 19, 1988, although it did not identify the total area of the parcel.  (*See* Ptf's Ex 1.05.)  Linstrom testified that the mean high water line did not change between 1988 and 2018.

Plaintiff also presented several sales of undeveloped riverfront land.  (*See* Ptf's Ex 14.)  Linstrom testified that only non-buildable land is comparable to the subject property.  (*See id.* at 1.)  He also provided a letter from Kolen explaining why Defendant did not consider any of those sales comparable.  (*Id.* at 9.)  A 0.15-acre parcel sold for $22,000 on April 20, 2015.  (*Id.* at 15.)  Kolen did not consider that a "good sale" or "open market transaction" because it was sold by a bank.  (*Id.* at 9.)  Linstrom included the lot next to tax lot 501, a 0.21-acre parcel, with no sales data.  (*Id.* at 16.)  Defendant assigned a 2017-18 real market value of $17,320 to that parcel.  (*Id.* at 1.)  A 0.22-acre parcel sold for $10,000 on January 8, 2014.  (*Id.* at 19.)  Kolen responded that the parcel is only accessible by boat and was sold to a relative, so it did not represent a market transaction.  (*Id.* at 9.)  The fourth sale was a 0.55-acre parcel that sold for

/ / /

$27,000 on May 14, 2015. (*Id.* at 24.) Kolen responded that it was "15 miles up river from [Plaintiff's] property" and that the market had "changed significantly" since 2015. (*Id.* at 9.)

> ii.     Improvements value

Plaintiff determined a value of $7,556 for the improvements based on estimates to replace each item. (Ptf's Ex 1 at 2.) He determined the cost to replace the multi-purpose shed would be $2,589, presumably based on the cost of a "Tuff Shed." (Ptf's Exs 1 at 2, 1.04 at 5.) Plaintiff also provided evidence that the cost, including delivery and installation, is $2,899. (Ptf's Ex 1.04 at 6.) Defendant assigned a 2017-18 value of $2,370 to the shed. (Ptf's Ex 1.02 at 8.)

Plaintiff determined a replacement cost totaling $4,967 for the floating dock and ramp. (*See* Ptf's Ex 1 at 2.) He provided a quote of $3,782.24 for the replacement cost of materials for the floating dock and ramp. (Ptf's Ex 1.04 at 1-3.) That quote did not include labor. Linstrom testified that labor would cost $30 per hour and the job would take two and a half days to complete. Wylie testified that Plaintiff's replacement cost estimate is unpersuasive because it is based on labor performed by friends and family, not market rates. Defendant assigned a value of $17,550 to the dock and $2,610 to the ramp in the 2017-18 tax year. (Ptf's Ex 1.02 at 8.) Kolen testified that, based on Defendant's "dock study," it would cost at least $30,000 for a contractor to build a dock in 2016. He did not provide a copy of the "dock study." Linstrom disputed whether the docks studied by Defendant were comparable to Plaintiff's dock.

Plaintiff assigned no value to the second dock. (*See* Ptf's Ex 1 at 2.) Linstrom testified that the dock is damaged and Plaintiff sold it to a neighbor for $100, but the neighbor had not retrieved it as of the trial date. Defendant's 2017-18 record includes no reference to the second dock. (*See* Ptf's Ex 1.02 at 8.)

/ / /

C.     *Maximum Assessed Value*

Plaintiff requests a reduction in the subject property's 2017-18 maximum assessed value to $28,322, the same as his requested real market value. (See Ptf's Ex 1 at 3.) Plaintiff presents several theories to support his requested reduction. First, Plaintiff maintains that the maximum assessed value is incorrect, in part, due to historical errors; for instance, he asserts that Defendant increased the maximum assessed value by three percent in a year that the maximum assessed value exceeded the real market value. (Ptf's Ex 1.00 at 1.) Linstrom testified that historical errors in the maximum assessed value, beginning with the 1995-96 real market value used to establish the initial maximum assessed value, have carried through to create an overstated 2017-18 maximum assessed value. (*See* Ptf's Ex 1.02 at 1-2 (table of subject property's historical values prepared based on Defendant's records).)

Second, Linstrom testified that the subject property's maximum assessed value reflects improvements that have been removed, namely the boathouse. Plaintiff filed with Defendant an application under ORS 308.146(8) requesting a maximum assessed value correction for the 2017-18 tax year to reflect the removal of the boathouse in 2012. (Ptf's Ex 2 at 7.) Wylie testified that Defendant adjusted the 2016-17 real market value to reflect the removal of the boathouse, but did not adjust the 2016-17 maximum assessed value because Plaintiff did not file the application at that time. (*See id*.) He testified that Defendant denied Plaintiff's application under ORS 308.146(8) for the 2017-18 tax year because the application must be made in the same year as the real market value correction. Defendant did not send Plaintiff a denial letter.

Finally, Linstrom testified that the subject property's maximum assessed value is incorrect due to square footage errors in both the land and improvements. Plaintiff filed with Defendant an application under ORS 311.234 to correct errors in square footage of the land and

improvements for the 2017-18 tax year. (Ptf's Ex 2 at 8.) Wylie testified that Plaintiff's application under ORS 311.234 was pending as of the date of trial. He testified that, because the application was received December 12, 2017, it was considered pending for the 2018-19 tax year. In response to the court's subsequent request for clarification, Defendant wrote that it opposes Plaintiff's request for a correction under ORS 311.234. (Def's Ltr, Aug 3, 2018.)

C.     *Values Requested*

Defendant initially determined the subject property's 2016-17 real market value was $85,650 and its maximum assessed value was $131,090. (Ptf's Ex 2 at 10.) In an Order mailed February 28, 2017, BOPTA reduced the 2016-17 real market value to $65,000. (*Id.*) For the 2017-18 tax year, Defendant determined the subject property's real market value was $73,190 and its maximum assessed value was $131,090. (Ptf's Ex 2 at 1.) BOPTA sustained the real market value and reduced the maximum assessed value to $117,770. (*Id.*) Plaintiff then appealed his 2016-17 and 2017-18 tax years to this court on March 15, 2018. (Ptf's Ex 1 at 1.) Plaintiff requests that both the real market value and the maximum assessed value be reduced to $28,322. (Ptf's Ex 1 at 2.) Defendant moved to dismiss Plaintiff's 2016-17 appeal and requests that the court increase the 2017-18 real market value to $108,480, which is based on the purchase price of $96,000 trended.[8] (*See* Def's Answer; Ex O.)

## II. ANALYSIS

The issues presented are the real market value and maximum assessed value of the subject property for the 2016-17 and 2017-18 tax years.

/ / /

---

[8] Wylie acknowledged at trial that he erroneously included $1,000 in the purchase price. Defendant's real market value conclusion should be $107,350 based on Defendant's trend of 1.13. (*See* Def's Ex O.)

The party seeking affirmative relief bears the burden of proof by a preponderance of the evidence. ORS 305.427.[9] A "[p]reponderance of the evidence means the greater weight of the evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Evidence that is inconclusive or unpersuasive fails to meet the burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Here, Plaintiff bears the burden of proof on his request for value decreases. Defendant bears the burden of proof on its request to increase the 2017-18 real market value.

A.      *2016-17 Appeal*

Plaintiff appealed the real market value and maximum assessed value of the subject property for the 2016-17 tax year. Defendant moved to dismiss the 2016-17 tax year appeal because it was not timely filed. To timely appeal a BOPTA order to the tax court, a complaint must be filed within thirty days after the order is mailed. ORS 305.280(4). The 2016-17 BOPTA order was mailed on February 28, 2017. Plaintiff did not file a complaint with the tax court until March 15, 2018, more than one year after the order was mailed.

When an appeal is not timely filed from a BOPTA order, the court may still hear the appeal under ORS 305.288 if the taxpayer either (1) alleges an error equal to or greater than 20 percent in the real market value of certain property used primarily as a dwelling; or (2)

/ / /

/ / /

/ / /

---

[9] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

establishes "good and sufficient cause"[10] for failing to timely appeal. ORS 305.288(1), (3). The subject property was not primarily used as a dwelling for the 2016-17 tax year; indeed, Plaintiff presented evidence that the subject property is not buildable. Additionally, Plaintiff has not alleged "good and sufficient cause" for his failure to timely appeal the 2016-17 BOPTA order. Accordingly, Defendant's motion to dismiss Plaintiff's 2016-17 tax year appeal is granted.

B.    *2017-18 Real Market Value*

"Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *2 (Or Tax M Div Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2017-18 tax year was January 1, 2017. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. Oregon Administrative Rule (OAR) 150-308-0240(2)(a); *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). Although all three approaches must be considered, all three approaches may not be applicable in each case. *Id.* In

---

[10] ORS 305.288(5)(b)(A) defines "good and sufficient cause" as "an extraordinary circumstance that is beyond the control of the taxpayer, or the taxpayer's agent or representative, and that causes the taxpayer, agent or representative to fail to pursue the statutory right of appeal[.]" It "[d]oes not include inadvertence, oversight, lack of knowledge, hardship or reliance on misleading information provided by any person except an authorized tax official providing the relevant misleading information." ORS 305.288(5)(b)(B).

addition to the three approaches to value, a recent sale of the subject property "is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973).

> 1.      *Sale of subject property*

Plaintiff purchased the subject property for a combined price of $65,000 or $95,000, depending on whether Plaintiff's allocation of $30,000 to personal property is accepted. The parties disagree whether the sales were "recent" under *Kem.* Whether a sale is "recent" depends on whether the conditions affecting value on the date of sale are similar to the conditions on the assessment date. *See Level 3 Communications, LLC v. Dept. of Rev.*, TC 5236, 2018 WL 2230557 at *8 (May 2, 2018). For instance, the court may consider changes in the market and changes in the character of the property. *See id.*

The subject property sales occurred on October 30, 2014, and April 8, 2015, roughly two years before the assessment date. Defendant determined that the market was improving between the date of the sales and the assessment date, so Defendant applied a trend of 1.13 to the total sale price. Plaintiff offered no contrary evidence concerning market conditions. In Plaintiff's view, however, the character of the subject property changed because he learned that he could not place fill to increase the parking area and because he learned that the subject property's true size is 0.12 acres rather than 0.25 acres based on the location of the high water line.

With respect to the fill permit, the court agrees with Defendant that expanding the subject property's available parking space might increase its value, but does not support a conclusion that the price paid for the subject property without that additional parking space was overstated.

The correct size of the subject property land may impact its real market value. On the one hand, the subject property deeds clearly state that the property boundary extends only to the high water line.[11] That supports Defendant's view that Plaintiff knew what he bought when he bought it. On the other hand, assuming Plaintiff is correct that the subject property is significantly smaller than described in the MLS listing and Defendant's records, Plaintiff may not have agreed to pay the same price had he known the true size of the parcel. Accordingly, the court declines to place weight on Plaintiff's purchase price.

Defendant's request to increase the real market value is similarly unpersuasive because it is based only on the purchase price. Moreover, Defendant failed to carry its burden of proving that the court should disregard the allocation of $30,000 to personal property for the boathouse permit. The court received no market evidence of the value of a boathouse permit.

### 2.    *Cost approach*

Although not labeled as such, Plaintiff's approach to estimating the subject property's real market value appears to be based on the cost approach. "In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.,* 19 OTR 51, 55 (2006) (quoting Appraisal Institute *The Appraisal of Real Estate* 63 (12th ed 2001)). The cost

/ / /

---

[11] Plaintiff's theory presented at trial focused on state ownership of submersible land, rather than property descriptions contained in the deeds. (*See* Ptf's Exs 1.06, 19, 20.) "Submersible lands" means "lands lying between the line of ordinary high water and the line of ordinary low water of all navigable waters * * * within the boundaries of [the State of Oregon]." ORS 274.005(8). The State of Oregon is the owner of all submersible lands of all *navigable* streams and lakes in this state, which have not become vested in any person. ORS 274.025 (emphasis added). To date, the Oregon Department of State Lands has not determined whether the Siletz is navigable. Generally, property owned by the state is exempt from property taxation. ORS 307.090(1).

approach is "particularly useful in valuing new or nearly new improvements," but is "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id.*

        i.      Land value

Plaintiff's primary methodology for estimating the land value—adjusting the tax roll land value downward—is unpersuasive. First, it is based on tax roll values rather than market evidence, such as comparable land sales. Second, it assumes, without proving, that a 5,000-square foot parcel would sell for the same price per square foot as a 10,000-square foot parcel.

Plaintiff also offered evidence of three undeveloped riverfront land sales, along with a letter from Kolen explaining why Defendant considered each sale unpersuasive. Under the sales comparison approach, "only actual market transactions of property comparable to the subject [property], or adjusted to be comparable, may be used," and all sales "must be verified to ensure they reflect arm's-length market transactions." OAR 150-308-0240(2)(c). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson*, 2003 WL 21263620 at *3.

At first glance, Plaintiff's sales tend to support a bare land value less than $45,000. However, two of the sales were not arm's-length market transactions. Additionally, Plaintiff made no adjustments for topographical and other differences between the subject property and the bare land sales. Finally, even if the court accepted that the subject property's bare land value is less than $45,000, the court received no evidence of the value of site developments, which must be added to the land value. *See* ORS 307.010(1)(a).

/ / /

/ / /

/ / /

ii.     Improvements value

Plaintiff's estimate of the replacement value of the subject property improvements is similarly unpersuasive.  He failed to provide competent evidence, such as a contractor's bid, of the cost of labor to construct a replacement dock and ramp.

3.     *Real market value conclusion*

For the reasons discussed above, the court concludes that the real market value evidence presented by the parties is unpersuasive and inconclusive.  As a result, the court is unable to determine the subject property's real market value as of January 1, 2017, and denies each party's request to change the 2017-18 real market value.

C.     *2017-18 Maximum Assessed Value*

Plaintiff is seeking a reduction in the 2017-18 maximum assessed value of the subject property and presented several theories supporting his request.

1.     *Historical error in the maximum assessed value*

Plaintiff's first theory is that historical errors in the maximum assessed value, beginning with the 1995-96 real market value used to establish the initial maximum assessed value, have carried through to create an overstated 2017-18 maximum assessed value.  Even if Plaintiff is correct about historical errors, the court is unable to grant relief on that basis.

Maximum assessed value for a given tax year is the greater of the property's maximum assessed value or 103 percent of its assessed value for the previous tax year.  ORS 308.146(1). The statute enumerates exceptions to that calculation, for example to account for new property or new improvements to property.  *See, e.g.,* ORS 308.146(3)(a).  Where the maximum assessed value for the tax year at issue is calculated in accordance with the statute, the court may not correct the maximum assessed value based on alleged errors in tax years not open for adjustment.

*See Kaufman v. Dept. of Rev.*, 20 OTR 159, 165 (2010) (rejecting taxpayers' argument that an error in the 2002-03 value could be corrected in the 2006-07, 2007-08, and 2008-09 maximum assessed values). If "the original owners failed to timely appeal the original [real market value] calculation, that unchallenged [real market value] became the base of the then current and future [maximum assessed value] calculations." *Id.* at 166. The court may not correct the subject property's 2017-18 maximum assessed value based on errors in the 1995-96 or other tax years that are not before the court.

      2.      *Errors in square footage of land and improvements*

Plaintiff's second theory is that the 2017-18 maximum assessed value should be corrected based on errors in the square footage of both land and improvements. Defendant opposes Plaintiff's request for corrections under ORS 311.234 because (1) the correction to the square footage of the improvements results in a net increase to the total improvements square footage; and (2) the correction to the land square footage is based on a February 2018 survey, which is too late after the January 1, 2017, assessment date. (Def's Ltr, Aug 3, 2018.)

ORS 311.234(2)(a) specifically provides for corrections to maximum assessed value due to errors in square footage:

> "The assessor shall correct the maximum assessed value of the property for the current tax year if, in the petition filed under this section, the petitioner demonstrates: (a) A difference between the actual square footage of the property as of the assessment date for the current tax year and the square footage of the property as shown in the records of the assessor for the tax year."

A correction made under ORS 311.234(2)(a) "must be proportional to the change in the real market value for the current tax year that is due to the correction of the square footage of the property." ORS 311.234(3)(a). The Department of Revenue's administrative rule provides procedures by which the assessor must determine the proportional change in maximum assessed

value. OAR 150-311-0240(4). The procedures each require a determination of the corrected real market value due to the square footage error. *See id.*

Plaintiff's request for relief under ORS 311.234 fails because Plaintiff has not established any reduction in real market value due to square footage errors. Regarding the improvements, Defendant correctly notes that the measurements taken by Sutton and agreed upon by the parties result in a net increase in the total square footage of the improvements. It is unlikely that a net increase in the size of improvements would result in a real market value reduction. In any event, the court received no competent evidence of real market value.

With respect to the land, Plaintiff presented evidence in the form of a 2018 survey that the parcel size may be significantly overstated on the tax and assessment roll. Defendant declined to make any correction, concluding that the survey was completed too late after the January 1, 2017, assessment date. The court questions Defendant's reasoning and failure to submit any rebuttal evidence supporting its inference that the mean high water line changed between January 2017 and February 2018. However, the court declines to order a correction because Plaintiff failed to demonstrate with competent evidence the impact on real market value due to the error in the subject property's land size.

3. *Correction for the removed building under ORS 308.146*

Plaintiff's final theory is that the maximum assessed value should be corrected to reflect the removal of the boathouse from the subject property in 2012. Defendant corrected the real market value to reflect the removed boathouse in the 2016-17 tax year, but did not concurrently correct the maximum assessed value because Plaintiff did not file the appropriate application.

/ / /

/ / /

"[W]hen a building is demolished or removed from property, *for the year in which the demolition or removal of the building is reflected by a reduction in real market value*, the maximum assessed value of the property may be reduced to reflect the demolition or removal of the building."

ORS 308.146(8)(a) (emphasis added). "To receive the reduction in maximum assessed value * * * the property owner must file an application with the county assessor after the demolition or removal and on or before December 31 following the assessment date if the demolition or removal occurred * * * [b]efore the January 1 assessment date." ORS 308.146(8)(c)(A). As with maximum assessed value corrections under ORS 311.234, the Department of Revenue has promulgated a rule explaining the procedure for correcting maximum assessed value under ORS 308.146(8). *See* OAR 150-308-0120. The procedure requires a determination of the "reduction in real market value" for the assessment year that is due to the destruction or removal of the building. *See id.*

Here, the subject property boathouse was removed in 2012 and Defendant corrected the 2016-17 real market value to reflect the removal of the boat house. However, Plaintiff did not file an application to correct maximum assessed value for the 2016-17 tax year, so Defendant did not correct the 2016-17 maximum assessed value. Plaintiff's application for a correction to the 2017-18 maximum assessed value is untimely based on the year of the real market value correction (2016-17). Accordingly, Defendant properly denied Plaintiff's application.

### III. COSTS AND DISBURSEMENTS

On November 1, 2018, Plaintiff filed a Statement for Costs and Disbursements seeking an award of $2,152. On November 5, 2018, Defendant filed its Objection to Plaintiff's Request for Costs and Disbursements, opposing the request because Plaintiff is not the prevailing party.

/ / /

Magistrates have discretionary authority to award costs and disbursements to the prevailing party. *See* ORS 305.490(2); *Wihtol I v. Dept. of Rev.*, 21 OTR 260, 267-68 (2013); Tax Court Rule–Magistrate Division (TCR–MD) 16 B. This court has determined that, as in the context of attorney fee awards, a prevailing party is one that receives a favorable judgment on a claim. *See Wihtol v. Multnomah County Assessor*, TC-MD 120762N, 2014 WL 274126 at *2 (Jan. 24, 2014). In this case, the court dismissed Plaintiff's 2016-17 tax year appeal and denied Plaintiff's 2017-18 tax year appeal. Plaintiff did not receive a favorable determination on any of its claims. As a result, Plaintiff is not the prevailing party in this case and may not receive an award of costs and disbursements under ORS 305.490(2) and TCR-MD 16.

## IV. CONCLUSION

Upon careful consideration, the court grants Defendant's motion to dismiss Plaintiff's 2016-17 tax year appeal as untimely filed. Having found the 2017-18 real market value evidence to be inconclusive, the court denies both Plaintiff's and Defendant's requests to correct the 2017-18 real market value of the subject property. Plaintiff failed to satisfy statutory requirements for a correction to the subject property's 2017-18 maximum assessed value. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's 2016-17 tax year appeal is dismissed as untimely.

IT IS FURTHER DECIDED that Plaintiff's 2017-18 tax year appeal is denied.

IT IS FURTHER DECIDED that Defendant's request to increase the real market value of property identified as Account R61258 is denied.

/ / /

/ / /

/ / /

IT IS FURTHER DECIDED that Plaintiff's request for costs and disbursements is denied.

Dated this ____ day of November 2018.

_____
ALLISON R. BOOMER
MAGISTRATE

***If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.***

***This document was signed by Magistrate Boomer and entered on November 16, 2018.***